## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| B. Kyle Benton, P.A.,<br><br>                          Plaintiff<br><br>v.<br><br>Delta Dental Insurance Company; DeltaCare USA; Delta USA Inc.; Delta Dental Plans Association; Delta Dental Insurance Company Alabama; Delta Dental of Alaska; Delta Dental of Arizona; Delta Dental of Arkansas; Delta Dental of California; Delta Dental of Colorado; Delta Dental of Connecticut; Delta Dental of Delaware; Delta Dental of the District of Columbia; Delta Dental of Florida; Delta Dental Insurance Company–Georgia; Hawaii Dental Service; Delta Dental of Idaho; Delta Dental of Illinois; Delta Dental of Indiana; Delta Dental of Iowa; Delta Dental of Kansas; Delta Dental of Kentucky; Delta Dental Insurance Company–Louisiana; Delta Dental of Maryland; Delta Dental of Massachusetts; Delta Dental of Michigan; Delta Dental of Minnesota; Delta Dental Insurance Company–Mississippi; Delta Dental of Missouri; Delta Dental Insurance Company–Montana; Delta Dental of Nebraska; Delta Dental Insurance Company–Nevada; Delta Dental of New Jersey; Delta Dental of New Mexico; Delta Dental of New York; Delta Dental of North Carolina; Delta Dental of North Dakota; Northeast Delta Dental (of Maine, New Hampshire and Vermont); Delta Dental of Ohio; Delta Dental of Oklahoma; Delta Dental of Oregon; Delta Dental of Pennsylvania; Delta Dental of Puerto Rico; Delta Dental of Rhode Island; Delta Dental of South Carolina; Delta Dental of South Dakota; Delta Dental of Tennessee; Delta Dental Insurance Company–Texas; Delta Dental Insurance Company–Utah; Delta Dental of Virginia; Delta Dental of Washington; Delta Dental of West Virginia; Delta Dental of Wisconsin; and Delta Dental of Wyoming.<br><br>                          Defendants | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................2

PARTIES ...........................................................................................................5

    A.    Plaintiff .........................................................................................5

    B.    Defendants .....................................................................................6

JURISDICTION, VENUE, AND PERSONAL JURISDICTION ...............................15

INTERSTATE COMMERCE ...............................................................................16

FACTUAL BACKGROUND ................................................................................17

    A.    The Delta Dental State Insurers ...................................................17

    B.    The Delta Dental Providers...........................................................20

    C.    Delta Dental's Market Dominance .................................................22

FACTUAL ALLEGATIONS ................................................................................31

I.    DELTA DENTAL ARE ENGAGED IN AN UNLAWFUL MARKET ALLOCATION CONSPIRACY ...................................................................31

II.    DELTA DENTAL IS ENGAGED IN AN UNLAWFUL PRICE FIXING CONSPIRACY ...........................................................................................34

III.    DELTA DENTAL IS ENGAGED IN AN UNLAWFUL REVENUE RESTRICTION CONSPIRACY .....................................................................36

IV.    DELTA DENTAL HAS EARNED SIGNIFICANT PROFITS FROM ITS UNLAWFUL CONSPIRACIES, AND FUNNELED THEM INTO EXCESSIVE EXECUTIVE COMPENSATION AND CAPITAL RESERVES ...................................37

V.    DELTA DENTAL'S ANTICOMPETITIVE AGREEMENTS SHOULD BE ENJOINED, AND DEFENDANTS SHOULD BE COMPELLED TO ALLOW COMPETITIVE MARKET CONDITIONS.................................................................40

VI.    PLAINTIFF HAS SUFFERED ANTITRUST INJURY .....................................45

CLASS ACTION ALLEGATIONS .......................................................................50

CAUSES OF ACTION ......................................................................................52

PRAYER FOR RELIEF .....................................................................................57

Plaintiff B. Kyle Benton, P.A., individually and on behalf of all others similarly situated, brings this class action based upon personal knowledge of his own acts and upon information and belief as to all other matters alleged herein, including the investigation of Plaintiff's counsel, against Defendants Delta Dental Insurance Company Alabama; Delta Dental of Alaska; Delta Dental of Arizona; Delta Dental of Arkansas; Delta Dental of California; Delta Dental of Colorado; Delta Dental of Connecticut; Delta Dental of Delaware; Delta Dental of the District of Columbia; Delta Dental of  Florida; Delta Dental Insurance Company–Georgia; Hawaii Dental Service; Delta Dental of Idaho; Delta Dental of Illinois; Delta Dental of Indiana; Delta Dental of Iowa; Delta Dental of Kansas; Delta Dental of Kentucky; Delta Dental Insurance Company–Louisiana; Delta Dental of Maryland; Delta Dental of Massachusetts;  Delta Dental of Michigan; Delta Dental of Minnesota; Delta Dental Insurance Company–Mississippi; Delta Dental of Missouri; Delta Dental Insurance Company–Montana; Delta Dental of Nebraska; Delta Dental Insurance Company–Nevada; Delta Dental of New Jersey; Delta Dental of New Mexico; Delta Dental of New York; Delta Dental of North Carolina; Delta Dental of North Dakota; Northeast Delta Dental (of Maine, New Hampshire and Vermont); Delta Dental of Ohio; Delta Dental of Oklahoma; Delta Dental of Oregon; Delta Dental of Pennsylvania; Delta Dental of Puerto Rico; Delta Dental of Rhode Island; Delta Dental of South Carolina; Delta Dental of South Dakota; Delta Dental of Tennessee; Delta Dental Insurance Company–Texas; Delta Dental Insurance Company–Utah; Delta Dental of Virginia; Delta Dental of Washington; Delta Dental of West Virginia; Delta Dental of Wisconsin; and Delta Dental of Wyoming (collectively, the "Delta Dental State Insurers"); and Delta Dental Insurance Company; DeltaCare USA; Delta USA Inc.; and Delta Dental Plans Association  (together, "Delta Dental Association," and together with the Delta Dental State Insurers, "Delta Dental" or "Defendants").

## NATURE OF THE ACTION

1.     This case involves Delta Dental's aggregation of unlawful monopsony power in the market for dental insurance across the United States.  Delta Dental secured this power through its artificial territorial division of that market among the Delta Dental State Insurers, and is abusing it to: (1) restrict competition between the Delta Dental State Insurers when operating under the "Delta Dental" brand (the "**Market Allocation Conspiracy**"); (2) reduce the amounts of reimbursement paid by the Delta Dental State Insurers to the dentists and dental practices who provide services to patients under Delta Dental insurance plans (the "**Price Fixing Conspiracy**"), and (3) restrict competition between the Delta Dental State Insurers when operating under *non*-"Delta Dental" brands (the "**Revenue Restriction Conspiracy**").

2.     The Delta Dental State Insurers are 48 predominantly not-for-profit dental services corporations that operate in 39 state or multi-state territories across the United States. They contract with dentists and dental practices—like named Plaintiff—that accept Delta Dental insurance (collectively, the "Delta Dental Providers") to reimburse the providers for dental services provided to Delta Dental insureds under Delta Dental insurance contracts.  The Delta Dental State Insurers are supported in turn by the Delta Dental Plans Association, a nationwide entity that acts as an administrator and watchdog for the Delta Dental insurance plans offered to the Delta Dental Providers and their patients via the Delta Dental State Insurers.  Delta Dental Plans Association is funded and controlled by the Delta Dental State Insurers, and acts as a vehicle for their concerted activity, including via a contract entered into by each Delta Dental State Insurer with the Delta Dental Plans Association (the "Delta Dental Plan Agreement").

3.     Acting as a concerted entity, Defendants are now the largest providers of insurance for dental services in the U.S., and have approximately 200,000 dental locations across the U.S.  By carving the 50 U.S. States into 39 exclusive territories in which the Delta Dental

State Insurers are guaranteed to be free from competition from other Delta Dental State Insurers, the Delta Dental State Insurers have each secured monosopony control within their assigned territories, and Defendants as a group have secured monosopony control over the market for dental insurance across the U.S.  Absent the monopsony powers and territorial protections secured to Defendants by the Market Allocation Conspiracy, dental plan sponsors and members would have greater choice as to the dental insurance they choose to purchase, and the Delta Dental Providers would have greater choice in the dental insurance they choose to accept from their patients.

4.    Defendants have built upon the monopsony control achieved through the Market Allocation Conspiracy to further unlawfully lessen competition in the market for dental insurance through two further conspiracies: the Price Fixing Conspiracy, and the Revenue Restriction Conspiracy.

5.    Defendants' Price Fixing Conspiracy takes the form of Defendants agreeing among themselves upon the rates at which they will reimburse the Delta Dental Providers for the services the providers offer to Delta Dental insureds.  By conspiratorial agreement, Defendants set these prices at lower than market rates, and then abuse their monopsony control of the dental insurance market to force these rates onto the Delta Dental Providers.  The Delta Dental Providers, faced with an overwhelming majority of patients who have purchased Delta Dental insurance (and naturally wish to be treated by a provider that accepts it) have little or no choice but to acquiesce to Defendants' non-competitive and artificially low reimbursement rates. Absent the Price Fixing Conspiracy—and the Market Allocation Conspiracy and Revenue Restriction Conspiracy, which leaves providers few or no alternative insurance plans to accept from patients—the Delta Dental Providers would have greater choice in the dental insurance they choose to accept, and thus greater choice in the reimbursement rates received for their services.

3

6.     These two conspiracies are buttressed by a third conspiracy:  Defendants'
Revenue Restriction Conspiracy takes the form of Defendants agreeing—via the Delta Dental
Plan Agreement—that the Delta Dental State Insurers will limit the amount of revenue they
derive from dental insurance sold *other* than under the "Delta Dental" brand, or that they will
derive from administering "Delta Dental" plans.  Many of the Delta Dental State Insurers could
develop and offer dental insurance under non-Delta Dental plans that would compete with their
Delta Dental plan offerings (or with the Delta Dental plan offerings of other Delta Dental State
Insurers), or they could compete to provide the services involved in administering Delta Dental
plans.  Instead, each of the Delta Dental State Insurers agrees, including via the Delta Dental
Plan Agreement, to limit the extent to which such competition occurs in order to retain the
valued Delta Dental business.  As a result of the Revenue Restriction Conspiracy, the Delta
Dental State Insurers—who, per the Market Allocation Conspiracy, have already agreed not to
compete with other Delta Dental State Insurers *under the Delta Dental brand*—further agree to
limit their competition with each other and with non-Delta Dental insurance providers *under
non-Delta Dental brands as well*.  The Delta Dental State Insurers thus risk losing their Delta
Dental franchise if they conduct too much business under other brands, or provide too many
administrative services under the Delta Dental brand, in competition with the Delta Dental plans
that they or other Delta Dental State Insurers offer.  Absent the restraints on competition for non-
Delta branded insurance business imposed by the Revenue Restriction Conspiracy, dental plan
sponsors and members would again have greater choice in the dental insurance they chose to
purchase, and the Delta Dental Providers would have greater choice in the dental insurance they
chose to accept from patients.  Absent the restraint on competition for administration of Delta
branded business imposed by the Revenue Restriction Conspiracy, companies seeking to have

their dental insurance plans administered by third parties would have greater choice among available administrators.

7.      All three of the Market Allocation Conspiracy, the Price Fixing Conspiracy, and the Revenue Restriction Conspiracy have reduced competition in the market for dental insurance in each of the territories in which the Delta Dental State Insurers are based and across the U.S. This decreased competition has harmed the Delta Dental Providers (in the form of reduced choice in the dental insurance plans they can accept from patients, and lower reimbursement rates paid to them under those plans), and has also harmed dental plan sponsors and members (in the form of higher premiums paid to Delta Dental in a non-competitive market, and through lower quality services offered to patients by the Delta Dental Providers that have been starved of reimbursement revenue by Defendants' artificially low prices).[1] While Defendants are predominantly non-profit entities, they have reaped the benefits of their anticompetitive conspiracies in the form of lavish executive compensation and by building up excessive capital reserves.

8.      All three of the Market Allocation Conspiracy, the Price Fixing Conspiracy, and the  Revenue Restriction Conspiracy also have given Delta Dental unequalled dominance in the market for dental insurance.  Delta Dental's dominance in this market gives it monopsonist control of the rates of reimbursement paid to the Delta Dental Providers.

## PARTIES

### A.      Plaintiff

9.      Plaintiff B. Kyle Benton, P.A ("Dr. Benton," or "Plaintiff"), is a dental services provider and a citizen of the state of Pennsylvania.  During the relevant time period, Dr. Benton

---

[1] Plaintiffs and the class, at this time, only include the Delta Dental Providers and do not include Delta Dental insureds.

provided dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental of Pennsylvania. As a result of the anticompetitive conduct alleged herein, Dr. Benton was deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Benton has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**B.    Defendants**

10.    Delta Dental Plans Association is located at 1515 22nd St # 450, Oak Brook, IL 60523, USA. Throughout the class period, Delta Dental Plans Association was comprised of and managed by a network of the Delta Dental State Insurers as listed and alleged herein.

11.    Delta Dental Insurance Company is located at P.O. Box 2059 Mechanicsburg, PA 17055-2059, and has Payer #AARP1. DeltaCare USA is located at P.O. Box 1810 Alpharetta, GA 30023, and has Claims Payer #DDCA2 and Encounter Payer #DDCA3. Delta USA Inc. is located at 1515 W 22nd Street, Suite 450, Oak Brook, IL 60523. Throughout the class period, Delta Dental insurance Company, DeltaCare USA, and Delta USA Inc. were affiliates or subsidiaries of Delta Dental Plans Association, and acted in concert with Delta Dental Plans Association and the Delta Dental State Insurers to implement and sustain the alleged conspiracies.

12.    Defendant Delta Dental Insurance Company–Alabama ("Delta Alabama") shares an address with Delta Dental Insurance Company–Georgia ("Delta Georgia"), and is located at P.O. Box 1809 Alpharetta, GA 30023-1809. Throughout the class period, Delta Alabama controlled as much as 21% of the market for dental insurance in the state of Alabama, and exercised control over Delta Dental Association.

13. Delta Dental of Alaska ("Delta Alaska") shares an address with Delta Dental of Oregon ("Delta Oregon"), and is located at 601 SW 2nd Avenue Portland, OR 97204, and has Payer #CDOR1. Throughout the class period, Delta Alaska controlled as much as 27.7% of the market for dental insurance in the state of Alaska, and exercised control over Delta Dental Association.

14. Delta Dental of Arizona ("Delta Arizona") is located at P.O. Box 43026 Phoenix, AZ 85080, and has Payer #86027. Throughout the class period, Delta Arizona controlled as much as 54.9% of the market for dental insurance in the state of Arizona, and exercised control over Delta Dental Association.

15. Delta Dental of Arkansas ("Delta Arkansas") is located at P.O. Box 15965 N. Little Rock, AR 72231-5965, and has Payer #CDAR1. Throughout the class period, Delta Arkansas controlled as much as 73.5% of the market for dental insurance in the state of Arkansas, and exercised control over Delta Dental Association.

16. Delta Dental of California ("Delta California") is located at P.O. Box 997330 Sacramento. CA 95899-7330, and has Payer #77777. Throughout the class period, Delta California controlled as much as 88% of the market for dental insurance in the state of California, and exercised control over Delta Dental Association.

17. Delta Dental of Colorado ("Delta Colorado") is located at P.O. Box 173803 Denver. CO 80217-3803, and has Payer #84056. Throughout the class period, Delta Colorado controlled as much as 78.8% of the market for dental insurance in the state of Colorado, and exercised control over Delta Dental Association.

18. Delta Dental of Connecticut ("Delta Connecticut") shares an address with Delta Dental of New Jersey ("Delta New Jersey") and has Payer #22189. Throughout the class period,

Delta Connecticut controlled as much as 35.4% of the market for dental insurance in the state of Connecticut, and exercised control over Delta Dental Association.

19.     Delta Dental of Delaware ("Delta Delaware") shares an address with Delta Dental of Pennsylvania, and has Payer #51022.  Throughout the class period, Delta Delaware controlled as much as 77.8% of the market for dental insurance in the state of Delaware, and exercised control over Delta Dental Association.

20.     Delta Dental of the District of Columbia ("Delta DC") shares an address with Delta Dental of Pennsylvania), and has Payer #52147.  Throughout the class period, Delta DC controlled as much as 54.7% of the market for dental insurance in the District of Columbia, and exercised control over Delta Dental Association.

21.     Delta Dental of  Florida ("Delta Florida") shares an address with Delta Dental Insurance Company–Georgia.  Throughout the class period, Delta Florida controlled as much as 51.6% of the market for dental insurance in the state of Florida, and exercised control over Delta Dental Association.

22.     Delta Dental Insurance Company–Georgia ("Delta Georgia") is located at P.O. Box 1809 Alpharetta, GA 30023-1809, and has Payer #94276.  Throughout the class period, Delta Georgia controlled as much as 58.4% of the market for dental insurance in the state of Georgia, and exercised control over Delta Dental Association.

23.     Hawaii Dental Service ("Delta Hawaii") is located at 700 Bishop  Street, Suite 700 Honolulu, HI 96813, and has Payer #99010.  Throughout the class period, Delta Hawaii controlled as much as 97.7% of the market for dental insurance in the state of Hawaii, and exercised control over Delta Dental Association.

24.     Delta Dental of Idaho ("Delta Idaho") is located at P.O. Box  2870 Boise, ID 83701, and has Payer #82029.  Throughout the class period, Delta Idaho controlled as much as

52.2% of the market for dental insurance in the state of Idaho, and exercised control over Delta Dental Association.

25.     Delta Dental of Illinois ("Delta Illinois") is located at P.O. Box 5402 Lisle, IL 60532, and has Payer #05030 (group plans) and Payer #IDIND (IL individual plans only). Throughout the class period, Delta Illinois controlled as much as 54.4% of the market for dental insurance in the state of Illinois, and exercised control over Delta Dental Association.

26.     Delta Dental of Indiana ("Delta Indiana") is located at P.O. Box 9085 Farmington Hills, Ml 48333-9085, and has Payer #DDPIN. Throughout the class period, Delta Indiana controlled as much as 47.5% of the market for dental insurance in the state of Indiana, and exercised control over Delta Dental Association.

27.     Delta Dental of Iowa ("Delta Iowa") is located at P.O. Box 9000 Johnston, lA 50131-9000, and has Payer #CDIA1. Throughout the class period, Delta Iowa controlled as much as 83.8% of the market for dental insurance in the state of Iowa, and exercised control over Delta Dental Association.

28.     Delta Dental of Kansas ("Delta Kansas") is located at 1619 N. Waterfront Parkway P.O. Box 789769 Wichita, KS 67278-9769, and has Payer #E3960. Throughout the class period, Delta Kansas controlled as much as 90.7% of the market for dental insurance in the state of Kansas, and exercised control over Delta Dental Association.

29.     Delta Dental of Kentucky ("Delta Kentucky") is located at P.O. Box 242810 Louisville, KY 40224-2810, and has Payer #CDKY1. Throughout the class period, Delta Kentucky controlled as much as 60.4% of the market for dental insurance in the state of Kentucky, and exercised control over Delta Dental Association.

30.     Delta Dental Insurance Company–Louisiana ("Delta Louisiana") shares an address with Delta Georgia. Throughout the class period, Delta Louisiana controlled as much as

50.4% of the market for dental insurance in the state of Louisiana, and exercised control over Delta Dental Association.

31.     Delta Dental of Maryland ("Delta Maryland") shares an address with Delta Dental of Pennsylvania, and has Payer #23166. Throughout the class period, Delta Maryland controlled as much as 23.1% of the market for dental insurance in the state of Maryland, and exercised control over Delta Dental Association.

32.     Delta Dental of Massachusetts ("Delta Massachusetts") is located at P.O. Box 2907 Milwaukee, WI 53201, and has Payer #04614. Throughout the class period, Delta Massachusetts controlled as much as 51.9% of the market for dental insurance in the state of Massachusetts, and exercised control over Delta Dental Association.

33.     Delta Dental of Michigan ("Delta Michigan") is located at P.O. Box 9085 Farmington Hills, MI 48333-9085, and has Payer #DDPMI. Throughout the class period, Delta Michigan controlled as much as 83.5% of the market for dental insurance in the state of Michigan, and exercised control over Delta Dental Association.

34.     Delta Dental of Minnesota ("Delta Minnesota") is located at P.O. Box 59238 Minneapolis, MN 55459-0238, and has Payer #26004 or 07000. Throughout the class period, Delta Minnesota controlled as much as 68.8% of the market for dental insurance in the state of Minnesota, and exercised control over Delta Dental Association.

35.     Delta Dental Insurance Company—Mississippi ("Delta Mississippi") shares an address with Delta Georgia. Throughout the class period, Delta Mississippi controlled as much as 87.7% of the market for dental insurance in the state of Mississippi, and exercised control over Delta Dental Association.

36.     Delta Dental of Missouri ("Delta Missouri") is located at P.O. Box 8690 St. Louis, MO 63126-0690, and has Payer #43090. Throughout the class period, Delta Missouri

controlled as much as 75.5% of the market for dental insurance in the state of Missouri, and exercised control over Delta Dental Association.

37.     Delta Dental Insurance Company–Montana ("Delta Montana") shares an address with Delta Georgia.  Throughout the class period, Delta Georgia controlled as much as 65.9% of the market for dental insurance in the state of Montana, and exercised control over Delta Dental Association.

38.     Delta Dental of Nebraska ("Delta Nebraska") is located at P.O. Box 245 Minneapolis, MN 55440-0245, and has Payer  #07027.  Throughout the class period, Delta Nebraska controlled as much as 87.8% of the market for dental insurance in the state of Nebraska, and exercised control over Delta Dental Association.

39.     Delta Dental Insurance Company–Nevada ("Delta Nevada") shares an address with Delta Georgia.  Throughout the class period, Delta Nevada controlled as much as 18.5% of the market for dental insurance in the state of Nevada, and exercised control over Delta Dental Association.

40.     Delta Dental of New Jersey ("Delta New Jersey") is located at P.O. Box 222 Parsippany, NJ 07054, and has Payer #22189.  Throughout the class period, Delta New Jersey controlled as much as 54.3% of the market for dental insurance in the state of New Jersey, and exercised control over Delta Dental Association.

41.     Delta Dental of New Mexico ("Delta New Mexico") is located at 2500 Louisiana Blvd., N.E. Suite 600 Albuquerque, NM 87110, and has Payer #85022.  Throughout the class period, Delta New Mexico controlled as much as 71.5% of the market for dental insurance in the state of New Mexico, and exercised control over Delta Dental Association.

42.     Delta Dental of New York ("Delta New York") shares an address with Delta Dental of Pennsylvania, and has Payer #11198.  Throughout the class period, Delta New York

11

controlled as much as 34.8% of the market for dental insurance in the state of New York, and exercised control over Delta Dental Association.

43.     Delta Dental of North Carolina ("Delta North Carolina") is located at P.O. Box 9085 Farmington Hills, Ml 48333-9085, and has Payer #56101.  Throughout the class period, Delta North Carolina controlled as much as 40.3% of the market for dental insurance in the state of North Carolina, and exercised control over Delta Dental Association.

44.     Delta Dental of North Dakota ("Delta North Dakota") is located at P.O. Box 59238 Minneapolis, MN 55459-0238, with Payer #26004.  Throughout the class period, Delta North Dakota controlled as much as 38.1% of the market for dental insurance in the state of North Dakota, and exercised control over Delta Dental Association.

45.     Northeast Delta Dental (Maine, New Hampshire and Vermont) ("Delta Northeast") is located at P.O. Box 2002 Concord, NH 03302-2002, and has Payer #02027. Throughout the class period, Delta Northeast controlled as much as 94.2% of the market for dental insurance in the state of Maine, as much as 96.9% in the state of New Hampshire, and as much as 100% in the state of Vermont, and exercised control over Delta Dental Association.

46.     Delta  Dental of Ohio ("Delta Ohio") is located at P.O. Box 9085 Farmington Hills, MI 48333-9085, and has Payer #DDPOH.  Throughout the class period, Delta Ohio controlled as much as 56.7% of the market for dental insurance in the state of Ohio, and exercised control over Delta Dental Association.

47.     Delta Dental of Oklahoma ("Delta Oklahoma") is located at P.O. Box 548809 Oklahoma City, OK 73154-8809, and has Payer #22229 and CDOK1.  Throughout the class period, Delta Oklahoma controlled as much as 81.2% of the market for dental insurance in the state of Oklahoma, and exercised control over Delta Dental Association.

48. Delta Dental of Oregon ("Delta Oregon") is located at 601 SW 2nd Avenue Portland, OR 97204, and has Payer #CDOR1. Throughout the class period, Delta Oregon controlled as much as 32.8% of the market for dental insurance in the state of Oregon, and exercised control over Delta Dental Association.

49. Delta Dental of Pennsylvania ("Delta Pennsylvania") is located at P.O. Box 2105 Mechanicsburg, PA 17055-6999, and has Payer #23166. Throughout the class period, Delta Pennsylvania controlled as much as 28.4% of the market for dental insurance in the state of Pennsylvania, and exercised control over Delta Dental Association.

50. Delta Dental of Puerto Rico ("Delta Puerto Rico") is located at P.O. Box 9020992 San Juan, PR 00902-0992, and has Payer #680652604. Throughout the class period, Delta Puerto Rico had significant power in respect of the market for dental insurance in Puerto Rico, and exercised control over Delta Dental Association.

51. Delta Dental of Rhode Island ("Delta Rhode Island") is located at P.O. Box 1517 Providence, RI 02901-1517, and has Payer #05029. Throughout the class period, Delta Rhode Island controlled as much as 78.6% of the market for dental insurance in the state of Rhode Island, and exercised control over Delta Dental Association.

52. Delta Dental of South Carolina ("Delta South Carolina") is located at P.O. Box 8690 St. Louis, MO 63126-0690, and has Payer #43091. Throughout the class period, Delta South Carolina controlled as much as 24.9% of the market for dental insurance in the state of South Carolina, and exercised control over Delta Dental Association.

53. Delta Dental of South Dakota ("Delta South Dakota") is located at P.O. Box 1157 Pierre, SD 57501, and has Payer #54097. Throughout the class period, Delta South Dakota controlled as much as 100% of the market for dental insurance in the state of South Dakota, and exercised control over Delta Dental Association.

54.     Delta  Dental of Tennessee ("Delta Tennessee") is located at 240 Venture Circle Nashville, TN 37228-1699, and has Payer #CDTN1.  Throughout the class period, Delta Tennessee controlled as much as 55.4% of the market for dental insurance in the state of Tennessee, and exercised control over Delta Dental Association.

55.     Delta Dental Insurance Company–Texas ("Delta Texas") shares an address with Delta Insurance Company—Georgia.  Throughout the class period, Delta Texas controlled as much as 74.7% of the market for dental insurance in the state of Texas, and exercised control over Delta Dental Association.

56.     Delta Dental Insurance Company–Utah ("Delta Utah") shares an address with Delta Insurance Company—Georgia.  Throughout the class period, Delta Georgia controlled as much as 27.9% of the market for dental insurance in the state of Utah, and exercised control over Delta Dental Association.

57.     Delta Dental of Virginia ("Delta Virginia") is located at 4818 Starkey Rd., Roanoke, VA 24018-8510, and has Payer #54084.  Throughout the class period, Delta Virginia controlled as much as 78.4% of the market for dental insurance in the state of Virginia, and exercised control over Delta Dental Association.

58.     Delta Dental of Washington ("Delta Washington") is located at P.O. Box 75983 Seattle, WA 98175, and has Payer  #91062.  Throughout the class period, Delta Washington controlled as much as 78.2% of the market for dental insurance in the state of Washington, and exercised control over Delta Dental Association.

59.     Delta Dental of West Virginia ("Delta West Virginia") shares an address with Delta Pennsylvania, and has Payer #31096.  Throughout the class period, Delta West Virginia controlled as much as 80% of the market for dental insurance in the state of West Virginia, and exercised control over Delta Dental Association.

14

60. Delta Dental of Wisconsin ("Delta Wisconsin") is located at P.O. Box 828 Stevens Point, WI 54481, and has Payer #39069. Throughout the class period, Delta Wisconsin controlled as much as 73.5% of the market for dental insurance in the state of Wisconsin, and exercised control over Delta Dental Association.

61. Delta Dental of Wyoming ("Delta Wyoming") is located at P.O. Box 29 Cheyenne, WY 82003-0029, and has Payer #CDWY1. Throughout the class period, Delta Wyoming controlled as much as 83.9% of the market for dental insurance in the state of Wyoming, and exercised control over Delta Dental Association.

## JURISDICTION, VENUE, AND PERSONAL JURISDICTION

62. Plaintiff brings federal antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

63. This Court has personal jurisdiction over each Defendant on multiple bases, including because: (1) some of the Defendants, including Delta Illinois, and parent companies Delta Dental Plan Association and Delta USA Inc., are incorporated in or have entered into contracts with Dental Service Providers in Illinois; (2) all of the Defendants have significant business in and contacts with Illinois through national insurance programs, both by way of their provision of dental goods, services, and facilities to consumers insured by Delta Dental in Illinois, and by their division of revenue resulting from such provision; (3) all Defendants conspired with Delta Dental Illinois and Delta Dental Plans Association; (4) all of the Defendants use the same forms containing the same terms and conditions—as prepared and proscribed by Delta Dental Plans Association—when dealing with Dental Service Providers; and (5) all of the Defendants require Dental Service Providers who are in the individual provider

15

networks of each Defendant to accept patients of the other Defendants, often without compensation for services rendered.

64.     Accordingly, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transacted business in this District.  This Court also has personal jurisdiction under Illinois law because Defendants participated in a conspiracy in which Delta Dental parent entities and at least one conspirator committed acts in furtherance of the conspiracy in Illinois.  This Court also has jurisdiction because Defendants in person or through their agents and co-conspirators transacted in business, contracted to supply goods and services, regularly do business, and derive revenue within Illinois.

65.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants transact business in this District, and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

66.     Defendants' activities as set out in this complaint have substantially affected and are within the flow of interstate trade and commerce.  Many of the Delta Dental Providers, including Plaintiff, provide services, goods, or facilities to persons who reside in other states.

67.     The Delta Dental Plans Association is involved in interstate commerce.  It controls many of the operations of each of the individual Delta Dental State Insurers, controls the marketing and use of the "Delta Dental" brand by each of the Delta Dental State Insurers, and dictates the terms and conditions—even to the point of drafting the "Delta Dental Provider Agreement" form—that each Delta Dental State Insurer imposes on each Delta Dental Provider.

16

68.     Plaintiff and other Delta Dental Providers have used interstate banking facilities and have purchased substantial quantities of good and services across state lines for use in providing dental services to Delta Dental insured consumers.

## FACTUAL BACKGROUND

### A.      The Delta Dental State Insurers

69.     The Delta Dental State Insurers are predominately not-for-profit entities that provide insurance plans for dental goods and services in their respective states or multi-state areas.  Through the insurance plans they offer and administer, the Delta Dental State Insurers reimburse the cost of dental goods and services provided to dental patients across the United States by the Delta Dental Providers—the dentists and dental practices who accept patients with Delta Dental insurance.

70.     The earliest Delta Dental State Insurers were created in approximately 1954 when dental service corporations were formed in states such as California, Oregon and Washington.  A dental service corporation is a legally constituted not-for-profit organization, incorporated on a state-by-state basis, that negotiates and administers contracts for dental care.  These corporations were created by dental practices and dental societies in response to requests from entities (such as workers unions) wishing to obtain a comprehensive plan for dental services for their members, and with the aim of increasing public access to oral health care.  The earliest dental service corporations, which have since become the Delta Dental State Insurers in most states, were originally sponsored and funded by the constituted dental societies in each state where they were formed.  The dental service plans offered by the dental service corporations were intended to provide full payment to dental service providers, with no additional payment required from a patient for their treatment beyond an agreed copayment or deductible.

71.     In the 1960's there was an increase in the number of state dental association-sponsored service corporations, and in the size of the groups or entities requesting dental care plans from the corporations.  In response, in 1966, the National Association of Dental Service Plans (later renamed as the "Delta Dental Plans Association") was created to bring together and coordinate the Delta Dental State Insurers in existence at that time.  From its creation, Delta Dental Plans Association worked to coordinate dental benefit programs for Delta Dental customers (and potential customers) that had employees in multiple states by allocating their insurance business (and potential business) to different Delta Dental State Insurers based on the states or territories in which the customer's employees were based.

72.     For example, in 1967, the Delta Dental State Insurer predecessor to Delta Dental Washington began providing dental insurance programs to labor unions, and sold the first multi-state dental insurance program to the International Association of Machinists.  With the assistance of Delta Dental Plans Association, Delta Dental Washington ceded administration for enrollees for this plan in states other than Washington to other Delta Dental State Insurers, beginning the territorial division that persists through to today in the form of the Market Allocation Conspiracy.

73.     Coverage was provided this way until the late 1980s when Delta Dental of California won the bid for the Office of the Civilian Health and Medical Program of the Uniformed Services program.  To centralize administration of this very large account, the Delta Dental State Insurers agreed to share their provider data through the Delta Dental Plans Association.  This led to the creation of the National Provider File, which was made available for commercial accounts in 1990 via DeltaCare USA, and which provided Delta Dental coverage to organizations with employees and subscribers located in multiple states.  It also gave Delta

Dental Plans Association access to the prices charged by the Delta Dental Providers across the country, and facilitated Defendants' implementation of the Price Fixing Conspiracy.

74.     Delta Dental Plans Association currently offers three dental plans through the Delta Dental State Insurers: (1) Delta Dental Premier, (2) Delta Dental PPO, and (3) DeltaCare USA:

     a.    Delta Dental Premier is a traditional fee-for-service plan that allows patients to visit any licensed dentist and to change dentists at any time without notifying Delta Dental.  Delta Dental Premier dentists agree to abide by Delta Dental's determination of fees. When a patient visits a Delta Dental Premier dentist, Delta Dental ensures the patient pays no more than the co-insurance percentage specified by their coverage.  Delta Dental Premier is Delta Dental's largest dentist network.

     b.    Delta Dental PPO is Delta Dental's preferred provider organization plan (a mid-priced fee-for-service plan).  Under Delta Dental PPO, patients have the flexibility to visit any licensed dentist, and usually enjoy lower out-of-pocket costs because PPO dentists have agreed to accept reduced fees for covered procedures when treating PPO patients.  Delta Dental PPO is Delta Dental's second largest dentist network.

     c.    DeltaCare USA is a prepaid plan that features set copayments, no annual deductibles and no maximums for covered benefits.  In most states, a patient must select a primary care dentist in the DeltaCare USA network dentist from whom they will receive treatment.  Typically, a patient's out-of-pocket expenses will be lower with DeltaCare USA than with Delta Dental Premier or Delta Dental PPO.

75.     Delta Dental Plans Association contracts with the Delta Dental State Insurers to offer these plans pursuant to the "Delta Dental Plans Agreement," under which the Delta Dental State Insurers are allowed to conduct marketing and advertising using the Delta Dental trademarks and copyrights in exchange for adhering to various rules governing the scope and conduct of their business.  Defendants collectively police the Delta Dental State Insurers' compliance with the Delta Dental Plans Agreement to ensure the Delta Dental State Insurers are abiding by its rules, and possess the power to terminate a Delta Dental State Insurer's contract in the event of non-compliance.

76.    In large part through the anticompetitive agreements and practices set out in this complaint—including through the collective coordination and management undertaken by Delta Dental National Association on their behalf—the separate Delta Dental State Insurers have grown collectively to become "[t]he most extensive dental network offering the widest selection of dentists nationwide."[2]   As of January 2019, it is estimated that the Delta Dental State Insurers were insuring more than 78 million dental patients in the United States.

**B.      The Delta Dental Providers**

77.    The Delta Dental Providers are dentists and dental practices—including named Plaintiff in this proceeding—who are all but forced to accept patients who are insured by Delta Dental, and lower-than-market reimbursement for dental goods and services provided to those patients, because of the Delta Dental State Insurers' market dominance and the anticompetitive practices described in this complaint.

78.    Most dental services in the United States are provided under a fee-for-service concept, in which a dentist or dental practice is reimbursed depending on whether the dentists is participating or nonparticipating (often referred to as *par* and *nonpar*) in respect of a given dental plan.  A participating dentist is one who has entered into a contractual agreement with a dental insurer to provide dental goods and service to persons who are eligible under a given dental insurance plan.

79.    The Delta Dental Providers receive reimbursement for dental goods and services provided to patients with Delta Dental insurance as participating Delta Dental dentists pursuant to contracts they enter into with the Delta Dental State Insurers (the "Delta Dental Provider Agreements").  These agreements stipulate the terms, conditions, and rates under which the Delta

---

[2] Delta Dental Website, "About Delta Dental insurance": https://www.dentalinsurance.com/delta-dental-insurance

Dental Providers can seek reimbursement from Delta Dental for services a Delta Dental patient elects to receive when visiting a Delta Dental Provider pursuant to a Delta Dental plan.

80.     The Delta Dental State Insurers actively solicit all dentists and dental practices in their assigned territory to participate in the Delta Dental plans.  The terms and conditions imposed by the Delta Dental Provider Agreements require that the Delta Dental Providers will:

a.      Charge Delta Dental insured patients the amounts established by the Delta Dental State Insurer, such that the Delta Dental Provider can neither increase nor decrease its fees for Delta Dental insured patients;

b.      Accept an agreed-upon schedule of rates (and where applicable, co-payments) for goods and services as payment-in-full for any goods and services provided to Delta Dental insureds, and not charge the insured any further amounts other than copayments or deductibles as specified under the Delta Dental Provider Agreement;

c.      Submit to audits by auditors from Delta Dental, who ensure that the Delta Dental Providers are charging patients the amounts set out in the Delta Dental Provider Agreement (and ancillary manual, which is an extension of the Delta Dental Provider Agreement), and otherwise adhere to any and all conditions in the agreement (and manual);

d.      Conform their operations to a manual written and maintained by the Delta Dental Plans Association and enforced by the Delta Dental State Insurers; and

e.      Accept and treat patients from outside the territory of the Delta Dental State Insurer with which the dentist has contracted, who are insured by a different Delta Dental State Insurer, without an assignment of benefits from the patient's Delta Dental State Insurer (meaning that the dentist must collect the fee for services from the usually out-of-State patient, with a low probability of collection).

81.     As outlined in more detail below, the Delta Dental Providers—including named Plaintiff in this proceeding—are routinely required to accept a discount of as much as 35%, or more, on market rates from the Delta Dental State Insurers when requesting reimbursement for the goods and services they provide to Delta Dental insured.[3]

_____

[3]  Indeed, Defendants themselves boast of achieving "the industry's best effective discount – averaging 19.6% nationally," as compared to average industry charges.  *See, e.g.,*

82.     This "take it or leave it" reimbursement rate discount is imposed upon the Delta Dental Providers by way of the Delta Dental Provider Agreement, and is an unavoidable cost of doing business with Delta Dental insureds.  Given Defendants' monopsony control of the relevant market and submarkets, the artificially low reimbursement rates that the Delta Dental Providers are forced to accept under the Delta Dental plans are preferable—from the provider's point of view—to the alternative of refusing to accept Delta Dental insurance at all.  This is because out-of-network dentists and dental providers can claim reimbursement for goods and services provided to Delta Dental insureds, but receive *even more* of a discount than in-network dentists like the Delta Dental Providers for doing so.[4]

83.     Defendants similarly set up further disincentives to ensure that dental service providers in the Delta Dental State Insurers' territories are faced with the Hobson's choice of either (1) accepting Delta Dental patients at discounted reimbursement rates pursuant to a Delta Dental Provider Agreement, or (2) accepting those patients on economic terms that are even more punitive for the providers.

## C.     Delta Dental's Market Dominance

84.     Through the above described conspiracies and anticompetitive practices, and including through their subsidiaries and affiliates, the Delta Dental State Insurers have achieved an unprecedented degree of dominance in the market for dental insurance.  They are typically the

---

Delta Dental, *Measuring Overall Network Value: Effective Discounts* (2011) https://www.deltadentalco.com/uploadedFiles/Brokers/EffectiveDiscount.pdf  This is possible only at the expense of Plaintiff and the class.

[4] "Nonpar" dentists, for example, who choose to offer dental goods and service to Delta Dental insureds despite not having entered into a Delta Dental Provider Agreement are typically reimbursed at the 50% percentile of rates for dentists in their region.  *I.e.*, they receive reimbursement at a level that is above the rate charged by 50% of dentists in the region for a given dental good or service, but *below* the rate charged by the other 50% of dentists in the region.  *Dentistry, Dental Practice, and the Community* (eBook), Brian A. Burt, Steven A. Eklund, at 92.  Delta patients are also financially incentivized not to visit non par dentists because they receive significantly lower insurance coverage from them.

largest providers of dental insurance plans within the territory they have been assigned under the Market Allocation Conspiracy, and are often the *only* viable provider of dental insurance for a patient in a given state.

85.     Indeed, as the following chart demonstrates, Delta Dental State Insurers across the country had an average of *67% market share* in their given allocated territories in 2017:[5]



86.     Delta Alaska is the Delta Dental licensee for Alaska.  Delta Alaska exercises considerable market power in Alaska, and from 2013 to 2017 controlled between 18.1% and 27.7% of that market.

_____

[5]   Companies identifying as a Delta Dental company in their name or website address were initially identified in the S&P (former SNL) National Association of Insurance Commissions ("NAIC") database and supplemented by checking the Delta Dental Plans Association's site and other sites for additional Delta Dental companies.  The SNL Group Name assigned to all those companies was used to find any additional companies beyond the 39 "official" member plans as reported by the Association.  The total list of Delta-owned companies comprised 75 companies.  Initial data indicated that at least two of the major Delta Dental companies (HDS in Hawaii, and Delta Dental of California) were missing, and so their premium data was gathered directly from the State insurance commissioner/regulator website reports.

87.     Delta Arizona is the Delta Dental licensee for Arizona.  Delta Arizona exercises considerable market power in Arizona, and from 2013 to 2017 controlled between 44.8% and 54.9% of that market.

88.     Delta Arkansas is the Delta Dental licensee for Arkansas.  Delta Arkansas exercises considerable market power in Arkansas, and from 2013 to 2017 controlled between 71% and 73.5% of that market.

89.     Delta California is the Delta Dental licensee for California.  Delta California exercises considerable market power in California, and from 2013 to 2017 controlled between 86.5% and 88% of that market.

90.     Delta Colorado is the Delta Dental licensee for Colorado.  Delta Colorado exercises considerable market power in Colorado, and from 2013 to 2017 controlled between 32.5% and 78.8% of that market.

91.     Delta Connecticut is the Delta Dental licensee for Connecticut.  Delta Connecticut exercises considerable market power in Connecticut, and from 2013 to 2017 controlled between 27.9% and 35.4% of that market.

92.     Delta Delaware is the Delta Dental licensee for Delaware.  Delta Delaware exercises considerable market power in Delaware, and from 2013 to 2017 controlled between 71.8% and 77.8% of that market.

93.     Delta DC is the Delta Dental licensee for the District of Columbia.  Delta DC exercises considerable market power in the District of Columbia, and from 2013 to 2017 controlled between 6.9% and 54.7% of that market.

94.     Delta Florida is the Delta Dental licensee for Florida.  Delta Florida exercises considerable market power in Florida, and from 2013 to 2017 controlled between 43.8% and 51.6% of that market.

95.     Delta Georgia is the Delta Dental licensee for Georgia.  Delta Georgia exercises considerable market power in Georgia, and from 2013 to 2017 controlled between 46.7% and 58.4% of that market.

96.     Delta Hawaii is the Delta Dental licensee for Hawaii.  Delta Hawaii exercises considerable market power in Hawaii, and from 2013 to 2017 controlled between 79.3% and 97.7% of that market.

97.     Delta Idaho is the Delta Dental licensee for Idaho. Delta Idaho exercises considerable market power in Idaho, and from 2013 to 2017 controlled between 1% and 52.2% of that market.

98.     Delta Illinois is the Delta Dental licensee for Illinois.  Delta Illinois exercises considerable market power in Illinois, and from 2013 to 2017 controlled between 50.6% and 54.4% of that market.

99.     Delta Indiana is the Delta Dental licensee for Indiana.  Delta Indiana exercises considerable market power in Indiana, and from 2013 to 2017 controlled between 40% and 47.5% of that market.

100.    Delta Iowa is the Delta Dental licensee for Iowa.  Delta Iowa exercises considerable market power in Iowa, and from 2013 to 2017 controlled between 72.5% and 83.8% of that market.

101.    Delta Kansas is the Delta Dental licensee for Kansas.  Delta Kansas exercises considerable market power in Kansas, and from 2013 to 2017 controlled between 84.2% and 90.7% of that market.

102.    Delta Kentucky is the Delta Dental licensee for Kentucky.  Delta Kentucky exercises considerable market power in Kentucky, and from 2013 to 2017 controlled between 58.1% and 60.4% of that market.

103.    Delta Louisiana is the Delta Dental licensee for Louisiana.  Delta Louisiana exercises considerable market power in Louisiana, and from 2013 to 2017 controlled between 11.4% and 50.4% of that market.

104.    Delta Maryland is the Delta Dental licensee for Maryland.  Delta Maryland exercises considerable market power in Maryland, and from 2013 to 2017 controlled between 14.7% and 23.1% of that market.

105.    Delta Massachusetts is the Delta Dental licensee for Massachusetts.  Delta Massachusetts exercises considerable market power in Massachusetts, and from 2013 to 2017 controlled between 16.2% and 51.9% of that market.

106.    Delta Michigan is the Delta Dental licensee for Michigan.  Delta Michigan exercises considerable market power in Michigan, and from 2013 to 2017 controlled between 77.6% and 83.5% of that market.

107.    Delta Minnesota is the Delta Dental licensee for Minnesota.  Delta Minnesota exercises considerable market power in Minnesota, and from 2013 to 2017 controlled between 67.7% and 68.8% of that market.

108.    Delta Mississippi is the Delta Dental licensee for Mississippi.  Delta Mississippi exercises considerable market power in Mississippi, and from 2013 to 2017 controlled between 76.4% and 87.7% of that market.

109.    Delta Missouri is the Delta Dental licensee for Missouri.  Delta Missouri exercises considerable market power in Missouri, and from 2013 to 2017 controlled between 69.3% and 75.5% of that market.

110.    Delta Montana is the Delta Dental licensee for Montana.  Delta Montana exercises considerable market power in Montana, and from 2013 to 2017 controlled between 41.3% and 65.9% of that market.

111.    Delta Nebraska is the Delta Dental licensee for Nebraska.  Delta Nebraska exercises considerable market power in Nebraska, and from 2013 to 2017 controlled between 85.8% and 87.8% of that market.

112.    Delta Nevada is the Delta Dental licensee for Nevada.  Delta Nevada exercises considerable market power in Nevada, and from 2013 to 2017 controlled between 10.1% and 18.5% of that market.

113.    Delta New Jersey is the Delta Dental licensee for New Jersey.  Delta New Jersey exercises considerable market power in New Jersey, and from 2013 to 2017 controlled between 48.2% and 54.3% of that market.

114.    Delta New Mexico is the Delta Dental licensee for New Mexico.  Delta New Mexico exercises considerable market power in New Mexico, and from 2013 to 2017 controlled between 65.6% and 71.5% of that market.

115.    Delta New York is the Delta Dental licensee for New York.  Delta New York exercises considerable market power in New York, and from 2013 to 2017 controlled between 33% and 34.8% of that market.

116.    Delta North Carolina is the Delta Dental licensee for North Carolina.  Delta North Carolina exercises considerable market power in North Carolina, and from 2013 to 2017 controlled between 18.5% and 40.3% of that market.

117.    Delta North Dakota is the Delta Dental licensee for North Dakota.  Delta North Dakota exercises considerable market power in North Dakota, and from 2013 to 2017 controlled between 23.1% and 38.1% of that market.

118.    Delta Northeast is the Delta Dental licensee for Maine, New Hampshire, and Vermont.  Delta Northeast exercises considerable market power in Maine, New Hampshire, and Vermont, and from 2013 to 2017 controlled between 87.6% and 94.2%  of that market in Maine,

27

between 90.4% and 96.9% of that market in New Hampshire, and between 99.9% and 100% of that market in Vermont.

119.    Delta Ohio is the Delta Dental licensee for Ohio. Delta Ohio exercises considerable market power in Ohio, and from 2013 to 2017 controlled between 49.6% and 56.7% of that market.

120.    Delta Oklahoma is the Delta Dental licensee for Oklahoma. Delta Oklahoma exercises considerable market power in Oklahoma, and from 2013 to 2017 controlled between 72.8% and 81.2% of that market.

121.    Delta Oregon is the Delta Dental licensee for Oregon. Delta Oregon exercises considerable market power in Oregon, and from 2013 to 2017 controlled between 28.8% and 32.8% of that market.

122.    Delta Pennsylvania is the Delta Dental licensee for Pennsylvania. Delta Pennsylvania exercises considerable market power in Pennsylvania, and from 2013 to 2017 controlled between 24.2% and 28.4% of that market.

123.    Delta Puerto Rico is the Delta Dental licensee for Puerto Rico. Delta Puerto Rico exercises considerable market power in Puerto Rico.

124.    Delta Rhode Island is the Delta Dental licensee for Rhode Island. Delta Rhode Island exercises considerable market power in Rhode Island, and from 2013 to 2017 controlled between 71.5% and 78.6% of that market.

125.    Delta South Carolina is the Delta Dental licensee for South Carolina. Delta South Carolina exercises considerable market power in South Carolina, and from 2013 to 2017 controlled between 20.7% and 24.9% of that market.

126.     Delta South Dakota is the Delta Dental licensee for South Dakota.  Delta South
Dakota exercises considerable market power in South Dakota, and from 2013 to 2017 controlled
between 98.1% and 100% of that market.

127.     Delta Tennessee is the Delta Dental licensee for Tennessee.  Delta Tennessee
exercises considerable market power in Tennessee, and from 2013 to 2017 controlled between
4.6% and 55.4% of that market.

128.     Delta Texas is the Delta Dental licensee for Texas.  Delta Texas exercises
considerable market power in Texas, and from 2013 to 2017 controlled between 46.1% and
74.7% of that market.

129.     Delta Utah is the Delta Dental licensee for Utah.  Delta Utah exercises
considerable market power in Utah, and from 2013 to 2017 controlled between 18% and 27.9%
of that market.

130.     Delta Virginia is the Delta Dental licensee for Virginia.  Delta Virginia exercises
considerable market power in Virginia, and from 2013 to 2017 controlled between 63% and
78.4% of that market.

131.     Delta Washington is the Delta Dental licensee for Washington.  Delta Washington
exercises considerable market power in Washington, and from 2013 to 2017 controlled between
74.1% and 78.2% of that market.

132.     Delta West Virginia is the Delta Dental licensee for West Virginia.  Delta West
Virginia exercises considerable market power in West Virginia, and from 2013 to 2017
controlled between 77.1% and 80% of that market.

133.     Delta Wisconsin is the Delta Dental licensee for Wisconsin.  Delta Wisconsin
exercises considerable market power in Wisconsin, and from 2013 to 2017 controlled between
66.2% and 73.5% of that market.

134.    Delta Wyoming is the Delta Dental licensee for Wyoming.  Delta Wyoming exercises considerable market power in Wyoming, and from 2013 to 2017 controlled between 81.6% and 83.9% of that market.

135.    As set out above, Delta Dental's market share has remained consistently high across the country in recent history.  As shown in the following chart, Delta Delta's average market share across the whole of the United States remained between 59% and 65% between 2013 and 2017.



US Nationwide Delta Dental Market Share

2013-2017 Average = 62.4%

Source: S&P database of insurance filings, California DMHC, Hawaii Insurance Commissioner

136.    These market share figures are conservative because they do not include revenue derived by Defendants through their administration of self-funded ERISA plans, and their underwriting for publicly-insured programs such as Medicare Advantage and Medicaid. Through such plan and programs, Defendants derive significant additional revenue and hold significant further market share in the form of  Delta Dental Providers that must deal with Delta Dental to receive reimbursements for patients covered by such plans and programs.

137.    But for the anticompetitive restrictions described in this Complaint, all of the above-described Delta Dental State Insurers would offer insurance for dental services outside of their assigned territories, throughout the United States, and in competition with the other Delta Dental State Insurers.  Such competition would result in greater dental insurance choice to dental plan sponsors and members, and higher reimbursement rates and payments to the Delta Dental Providers.

## FACTUAL ALLEGATIONS

### I.    DELTA DENTAL ARE ENGAGED IN AN UNLAWFUL MARKET ALLOCATION CONSPIRACY

138.    The Market Allocation Conspiracy is an agreement between the Delta Dental State Insurers to provide dental insurance *exclusively* in the territories where the Delta Dental State Insurers are located, and amounts to an unlawful conspiracy of horizontal allocation of the market for dental insurance within each of those territories and across the United States.

139.    In furtherance of the Market Allocation Conspiracy, and by way of the Delta Dental Plans Agreement, Defendants have agreed (1) to divide the market for dental insurance into 39 state-by-state (or, occasionally, multi-state by multi-state) territories allocated to the exclusive control of the 50 Delta Dental State Insurers, and (2) that the Delta Dental State Insurers will not sell or attempt to sell dental insurance to dental plan sponsors or members outside of each Delta Dental State Insurer's allocated territory.

140.    Evidence of the Market Allocation Conspiracy exists in the Delta Dental State Insurers' Annual Statements to the insurance departments responsible for the provision and administration of insurance in each of the states where the Delta Dental State Insurers are based. The Delta Dental State Insurers are required to file these statements to report their annual revenues and profits, and in so doing have confirmed the operation of the Market Allocation Conspiracy.   For example, Schedule T to these annual statements is entitled "Premiums and

Other Considerations: Allocated by States and Territories," and requires each of the Delta Dental State Insurers to list the total amount of premiums received from Delta Dental insureds on a state-by-state basis. To the extent that Plaintiff has been able to obtain copies of these statements from the public record, Schedule T in every case reveals that the Delta Dental State Insurers obtained revenue from premiums *exclusively* from insureds located *within* the single state (or occasionally, the multi-state) territory allocated to the reporting Delta Dental State Insurers. In no case—including when the market for dental insurance could reasonably be expected to extend to dental plan sponsors and members located across state lines—did a Delta Dental State Insurer report *any* income received from outside of its allocated territory.[6]

141.    This deliberate allocation of the territories in which each Delta Dental State Insurer can conduct its business, and the corresponding agreement that the Delta Dental State Insurers will not compete with each other in respect of dental insurance business outside of their respective allocated areas, has reduced competition in the market for dental insurance in all of the territories in which the Delta Dental State Insurers were based, and thus reduced competition across the United States as a whole.

142.    In the absence of the Market Allocation Conspiracy the Delta Dental State Insurers would compete for dental insurance business across state lines, and outside of and between the territories they presently have allocated exclusively among themselves. Dental plan sponsors and members in Carson City, Nevada, for example, would not be restricted to accepting the terms and conditions of the plans offered by Delta Dental Nevada (headquartered

---

[6] See, e.g., *Annual Statement of the Delta Dental Plan of Arkansas, Inc., to the Insurance Department of the State of* Arkansas (Year Ending December 31, 2016), at 38; *Annual Statement of The Delta Dental Plan of New Mexico, Inc. to the Insurance Department of the State of New* Mexico (Year Ending December 31, 2016), at 38; *Annual Statement of the Delta Dental of Iowa to the Insurance Department of the State of Iowa* (Year Ending December 31, 2017), at 38; *Annual Statement of the Delta Dental of Rhode Island to the Insurance Department of the State of Rhode Island* (Year Ending December 31, 2017), at 38.

approximately 2400 miles away in Georgia). Instead, they could also consider the terms and conditions of any plans offered by Delta Dental California and available to their neighbors 130 miles away in Sacramento, California, and vice versa. Delta Dental Nevada and Delta Dental California would then be required to compete for these dental insurance customers, as would all of the Delta Dental State Insurers in respect of dental plan sponsors and members in all of the market and submarkets for dental insurance across the U.S. Multiple other examples of the Market Allocation Conspiracy exist—such as Delta Dental Connecticut's only selling insurance to plan sponsors and members in Connecticut, and not in the greater New York area—and further demonstrate the anticompetitive and economically artificially nature of the conspiracy.

143. Competition between the Delta Dental State Insurers would benefit dental plan sponsors and members by driving down the premium prices that members as patients are required to pay for such insurance, or by increasing the scope of the coverage offered under an insurance policy for the same premium price. Such competition would also give the Delta Dental Providers greater choice in respect of the dental insurance plans they could accept from potential dental patients. This choice would free the providers from the monopsony control and below-market reimbursement rates imposed upon them by whichever Delta Dental State Insurer is allocated exclusive control of the territory in which the provider was based.[7]

144. Due to Defendants' implementation and maintenance of the Market Allocation Conspiracy, Plaintiff and the Delta Dental Providers have received less reimbursement for the

---

[7] A dental insurer offering a dental plan needs at least two things for the plan to succeed: (1) patients willing to pay the dental insurer's premiums in exchange for the terms and coverage offered by the plan, and (2) dental providers willing to accept patients under that plan given the reimbursement rates the dental insurer is offering for the good and services provided to the dental patient. In a free and competitive market, patients will not accept the plan if the dental insurer's premiums are too high, and dental providers will not accept the plan if the dental insurer's reimbursement rates are too low.

goods and services they provided to the Delta Dental insureds, and have been injured in their property and business as a result.

## II.  DELTA DENTAL IS ENGAGED IN AN UNLAWFUL PRICE FIXING CONSPIRACY

145.    In addition to entering the Market Allocation Conspiracy to divide and control the territories in which the Delta Dental State Insurers offer dental insurance, Defendants have also colluded to use their dominant market position to fix artificially low the rates at which they reimburse Delta Dental Providers for goods and services provided to Delta Dental insureds.

146.    The Price Fixing Conspiracy is a collusive agreement reached among Defendants, and implemented through the Delta Dental Provider Agreement entered between the Delta Dental State Insurers and the Delta Dental Providers.  Defendants draw upon their access to market rates data for dental goods and services across the U.S. via the records obtained and held by Delta Dental Plans Association, and use these to determine the sub-market rates they will impose upon the Delta Dental Providers pursuant to the Delta Dental Provider Agreement.

147.    As outlined above, the Delta Dental Providers are all but forced to enter into the Delta Dental Provider Agreement with their respective Delta Dental State Insurers—and to accept the artificially low reimbursement rates set out therein—because of Defendants' monopsony control of the market for dental insurance in territories allocated to the Delta Dental State Insurers, and in submarkets across the U.S.  In California, for example, Delta Dental California controls approximately 87% of the dental insurance market.  A dentist or dental practice in that state accordingly is faced with an overwhelming majority of patients who have subscribed to one of the Delta Dental insurance plans, and wish to be treated by a dentist or dental practice willing to accept that plan.  The dentist or dental practice can either turn away the patient, accept the patient as a *nonpar* (non-participating) Delta Dental dentist, or accept the patient as a *par* (participating) Delta Dental dentist.  Both turning away the patient, or accepting

34

them as a nonparticipating Delta Dental dentist (subject to very low reimbursement rates and other disincentives that nonpar dentists receive), are deeply suboptimal choices for the dentist.[8] With no realistic alternative, the dentist—like the Delta Dental Provider serving as named Plaintiff in this Complaint—is required to accept the Delta Dental Provider Agreement and its submarket rates in order to access the majority of dental patients in the provider's state, and thereby to maintain a viable dentistry business.

148.    The lower-than-market reimbursement received from the relevant Delta Dental State Insurer may also have incentivized dentists across the U.S. towards providing sub-optimal care, or even forgoing medically necessary care.  For example,  a dentist—knowing that the reimbursement she or he will receive from Delta Dental will not cover a procedure that is necessary or optimal for a patient—may be required to provide a more limited procedure.  Dental patients, receiving a light cleaning rather than a deep cleaning, or a tooth extraction rather than a crown, say, are disadvantaged in such situations as a result.  As another example of the consequences of Delta Dental's anticompetitive reimbursement practices: Delta Dental Providers are required to accept and treat patients from outside the territory of the Delta Dental State Insurer with which the dentist has contracted, without an assignment of benefits from the patient's Delta Dental State Insurer (meaning that the dentist must collect the fee for services from the usually out-of-State patient, with a low probability of collection).  As a result, a dentist may opt to do only temporary or highly necessary work for an out-of-State patient who is not insured by the Delta Dental State Insurer with which that dentist has contracted.  In such circumstances, the dentist knows that the patient's Delta Dental State Insurer will not reimburse

_____

[8] Indeed, dentists are highly constrained by law in the extent to which they can decline patients on the basis of a patient's ability to pay, or a patient's chosen method of payment.

the dentist directly for their work, and the dentist will have to collect from that out-of-State patient.

149.    Absent the Price Fixing Conspiracy (and the Market Allocation Conspiracy which gives the Delta Dental Providers no choice but to accept the rates as determined via the Price Fixing Conspiracy), the Delta Dental Providers would have a choice among the dental insurance plans they could accept from their patients. They would then be better positioned to negotiate with the Delta Dental State Insurers for higher reimbursement rates for the goods and services they provide to Delta Dental insureds under Delta Dental insurance plans.

150.    Due to Defendants' implementation and maintenance of the Price Fixing Conspiracy, Plaintiff and the Delta Dental Providers have received less reimbursement for the goods and services they provided to Delta Dental insureds, and have been injured in their property and business as a result.

## III.    DELTA DENTAL IS ENGAGED IN AN UNLAWFUL REVENUE RESTRICTION CONSPIRACY

151.    In addition to the Market Allocation Conspiracy and the Price Fixing Conspiracy, Defendants have engaged in a third conspiracy to restrict the amount of revenue that any Delta Dental State Insurer is permitted to derive from selling dental insurance outside of the "Delta Dental" brand.

152.    This Revenue Restriction Conspiracy is set by the Delta Dental Plans Association, and agreed to by the Delta Dental State Insurers pursuant to the Delta Dental Plan Agreement.  It mandates that the Delta Dental State Insurers limit or restrain the extent to which they conduct dental insurance business and derive revenues other than under the Delta Dental brand.

153.    Several of the Delta Dental State Insurers do conduct dental insurance business other than under the Delta Dental brand, and all of the Delta Dental State Insurers *could* do so. Indeed, through their administration of the Delta Dental plans, the Delta Dental State Insurers

36

have the skills and knowledge required to conduct a significant amount of business in offering dental services that would compete with the Delta Dental plans. Yet the Delta Dental State Insurers, even where they have incorporated for profit subsidiaries to conduct certain dental insurance business, have operated carefully in a way to avoid competing with the plans offered by other Delta Dental State Insurers, or the dental businesses operated by the subsidiaries of other Delta Dental State Insurers.

154.    The Revenue Restriction Conspiracy thus amounts to a significant restraint on trade because it directly limits the amount of competition and the number of competitors in the market (or any of the submarkets) in which the Delta Dental State Insurers (or their subsidiaries) could compete for customers. Absent the Revenue Restriction Conspiracy, there would be greater competition for dental insurance and other dental services, which would result in greater insurance choice and lower premiums for dental plan sponsors and members, and greater insurance choice and higher rates of reimbursement for dental goods and services provided by dentists and dental practices.

## IV.    DELTA DENTAL HAS EARNED SIGNIFICANT PROFITS FROM ITS UNLAWFUL CONSPIRACIES, AND FUNNELED THEM INTO EXCESSIVE EXECUTIVE COMPENSATION AND CAPITAL RESERVES

155.    While many of the Defendants are not-for-profit entities, their directors and executives have received lavish executive compensation as a reward for implementing and maintaining the highly profitable conspiracies described above. Defendants have also used their ill-gotten gains to build stockpiles of excessive capital reserves.

156.    For example, a review of the Delta Dental State Insurers' publicly available Inland Revenue Service Form 990's ("Return of Organization Exempt from Income Tax") for 2016 demonstrates that the executives of these not-for-profit companies are frequently receiving

million, or *multi*-million, dollar annual salaries. The following table provides a sample of the salaries paid to the executives responsible for maintaining Defendants' conspiracies:

| Examples of Delta Dental State Insurers' Executive Compensation in 2016 | | |
|---|---|---|
| **Delta Dental State Insurer** | **Executive, and Title** | **Compensation** |
| Delta Dental California | Anthony S. Barth, President/CEO | 6,043,710[9] |
| Delta Dental Delaware | Gary D. Radine, Former President/CEO | $7,607,525 |
| | Michael J. Castro, EVP/CFO | $2,711,964 |
| | Michael G. Hankinson, EVP/CLO | $2,040,945 |
| Delta Dental District of Columbia | Nilesh C. Patel, EVP | $1,806,328 |
| | Alicia F. Weber, SVP | $1,573,356 |
| Delta Dental Illinois | Bernard Glossy, President/CEO | $1,280,552 |
| Delta Dental New York | Michael G. Hankinson, EVP/CLO | $2,040,945 |
| | Belinda Martinez, EVP | $1,928,593 |
| | Rick R. Doering, SVP | $1,561,892 |
| Delta Dental Ohio | Laura L. Czelada, President/CEO | $9,213,107[10] |
| | Goran Jurkovic, CFO | $1,636,919[11] |
| Delta Dental Virginia | Dr. George A. Levicki, President | $1,077,511 |
| Delta Dental Rhode Island | Joseph Nagle, President/CEO | $1,438,636 |

---

[9] Plus $8,284,122 in "other compensation from the organization and related organizations." Form 990 for Delta Dental of California, Inc. (2016), Part VII.

[10] Plus $2,693,718 in "other compensation from the organization and related organizations." Form 990 for Delta Dental Plan of Ohio, Inc. (2016), Part VII.

[11] Plus $1,412,846 in "other compensation from the organization and related organizations." *Id.*

157.    These extravagant compensation packages belie the Delta Dental companies'

status as not-for-profit entities, and explain Defendants' powerful motive to implement and

maintain the above-described conspiracies.  As the following chart demonstrates, more than half

of the not-for-profit Delta Dental State Insurer's CEO receive compensation of more than

$1,000,000 per year:



158.    These figures do not represent typical compensation in the non-profit industry.

The average Delta Dental State Insurer CEO's compensation (across the 31 entities who report

the relevant data) in 2016 was $3,145,912, whereas the average U.S. nonprofit CEO's

compensation during the same time period was $146,653.  The average Delta Dental State

Insurer CEO thus earned more than *20 times* the amount of the average nonprofit CEO in the

U.S.

159.     In addition to their generous compensation, Delta Dental executives are also permitted to travel first class, and to expense social club dues.  In at least one state, a coalition of concerned dentists has petitioned the state attorney general to investigate whether the nature and extent of the compensation received by the executives of the local Delta Dental State Insurer violates the laws regarding compensation paid to executives of a charitable organization.[12]

160.     Defendants have also used the illicit revenue derived from their conspiracies to build excessive capital reserves, far beyond their annual liabilities.  For example, in 2016 Delta Dental New Jersey had total assets of $321 million, and total liabilities of only $80 million; Delta Dental Illinois had total assets of $145 million compared to total liabilities of only $44.8 million; Delta Dental Ohio had total assets of almost $200 million, and total liabilities of only $37.8 million; and Delta Dental Rhode Island had total assets of almost $114 million, and total liabilities of only $21.8 million.

161.     Together, Delta Dental's fat salaries and bulging reserves demonstrate that its "not-for-profit" companies are in fact motivated to and do derive significant supra-competitive profits from their anticompetitive practices.

## V.     DELTA DENTAL'S ANTICOMPETITIVE AGREEMENTS SHOULD BE ENJOINED, AND DEFENDANTS SHOULD BE COMPELLED TO ALLOW COMPETITIVE MARKET CONDITIONS

162.     As outlined above, the Delta Dental State Insurers have considerable market power in respect of each of the markets and submarkets for insurance for dental goods and services in which the Delta Dental State Insurers conduct business.  Defendants are using that market power to engage in anticompetitive practices that are causing ongoing harm in those

---

[12] Petition against Dental Service of Massachusetts, Inc., d/b/a Delta Dental and its Affiliates regarding Misuse of Charitable Assets and Anticompetitive Conduct that harms Dental Healthcare Consumers in Massachusetts (May 23, 2017) ("Massachusetts Petition"), at 10.

markets and submarkets in each of the territories allocated to the Delta Dental State Insurers, and thus across the United States as a whole.

163.    The Market Allocation Conspiracy is anticompetitive because it prevents competition among the Delta Dental State Insurers within and between each of the territories allocated to the Delta Dental State Insurers.  This lack of competition in turn strengthens the market dominance of the Delta Dental State Insurers, which creates a unfair barrier to entry for non-Delta Dental branded dental insurance providers seeking to provide dental insurance within the Delta Dental territories.  The conspiracy is implemented and enforced by the Delta Dental Plan Agreement.  Pursuant to that agreement, the Delta Dental State Insurers restrict their offering of dental insurance to their assigned territories; in exchange, the supra-competitive premiums they enjoy as a result of exercising their monopsony power to underpay the Delta Dental Providers are funneled back to Delta Dental Plans Association, and distributed to the other Delta Dental State Insurers.  In order to remedy these anticompetitive practices, Defendants should be enjoined from their territorial restrictions and the Delta Dental State Insurers should be permitted to offer Delta Dental insurance outside of their assigned territories and in competition with other Delta Dental State Insurers.

164.    The Revenue Restriction Conspiracy is also anticompetitive because it places a direct cap on the amount of business the Delta Dental State Insurers can generate under their non-Delta Dental insurance plans and in competition to their Delta Dental business.  This conspiracy is also implemented via the Delta Dental Plan Agreement, and prevents the Delta Dental State Insurers from developing and offering dental insurance under non-Delta Dental plans that would compete with their Delta Dental plan offerings, and from competing with the Delta Dental plan offerings of other Delta Dental State Insurers.  Defendants should be enjoined from the revenue restriction, and allowed to derive an unlimited amount of revenue from their

non-Delta Dental-branded dental insurance business. This would allow dental plan sponsors and members greater choice for dental insurance, which would in turn allow the Delta Dental Providers greater choice in the insurance plans they could chose to accept (and thus also in the reimbursement rates they were offered pursuant to those plans).

165. Finally, the Price Fixing Conspiracy is also anticompetitive. Fair competition between the Delta Dental State Insurers is restricted by Defendants' (1) agreeing among themselves the rates at which they will reimburse the Delta Dental Providers for the services the providers offer to Delta Dental insureds, and then (2) abusing their monopsony control to force these artificially low rates onto the Delta Dental Providers. Defendants should be enjoined from colluding to set the reimbursement rates offered to the Delta Dental Providers, so the providers (and their patients) can benefit from the higher reimbursement rates that would result if the Delta Dental State Insurers were forced to compete.

166. Delta Dental's conduct in engaging in the Market Allocation Conspiracy, the Price Fixing Conspiracy, and the Revenue Restriction Conspiracy is per se anticompetitive.

167. At the same time, Defendants possess market power in the relevant markets, the conspiracies each have significant anticompetitive effects in respect of non-substitutable products within those markets, and the conspiracies had no or insufficient pro-competitive justifications. Thus Defendants would be liable for each and all of the alleged conspiracies even under a rule of reason analysis.

168. The relevant markets are the nationwide, interstate, and state-wide markets for the provision of dental insurance. As set out above, the majority of the Delta Dental State Insurers conduct the entirety of their business within a single state, with a minority of the Delta Dental State Insurers conducting the entirety of their business within two or three contiguous states. As also set out above, the Delta Dental State Insurers are present in all of the U.S. states, and act

through the Delta Dental Plans Association to organize and implement their business activity in respect of the market for dental insurance across the United States as a whole.

169. The Delta Dental State Insurers, including as acting through the Delta Dental Plans Association, exercise considerable market power in the markets in which they operate. As set out above, almost every Delta Dental State Insurer controls at least 20% of the market for dental insurance in the state in which it operates; more than half control more than 50% of that market in the state in which they operate; and several control almost 100% of that market in the state in which they operate. Together, and on average when acting through the Delta Dental Plans Association, the Delta Dental State Insurers control 65% of the market for dental insurance in the market across the U.S.

170. As also set out above, Defendant have exercised this market power to achieve significantly anticompetitive purposes with few or no compensatory features in respect of each of the three alleged conspiracies. The Market Allocation Conspiracy is a horizontal territorial division agreed and enforced by the Delta Dental State Insurers with each other and through the Delta Dental Plans Association. It serves the sole purpose of protecting each of the Delta Dental State Insurers from competition by other Delta Dental State Insurers within the territories allocated to each insurer. These territorial allocations serve no pro-competitive purpose, and exist only to protect the monopoly power and market dominance of each of the Delta Dental State Insurers in their assigned territories.

171. The Price Fixing Conspiracy is an agreement between the Delta Dental State Insurers, who would be competitors but for the Market Allocation Conspiracy, and exists solely to allow the Delta Dental State Insurers to share the Delta Dental State Providers' pricing information between themselves, and thereby to determine the lowest and most punitive rates of reimbursement that the Delta Dental State Providers are willing to accept. The Price Fixing

Conspiracy, in theory, could have the pro-competitive benefit of lowering the dental insurance premiums paid by dental insurance plan sponsors and members in each of the state, multi-state, or national territories in which Defendants conduct business.  Or, it would allow Delta Dental to return significant funds to the dental providers and communities that Delta Dental ostensibly serves so they could invest in better facilities, equipment, and patient services.  Delta Dental does neither of these things however.  Instead, as set out above, Delta Dental channels the lion's share of the profits it makes from its conspiracy to keep reimbursement rates low back into lavish compensation for its executives and over-inflated capital reserves.  No plausible procompetitive benefit is achieved or advanced by Delta Dental's imposition of punishingly below-market reimbursement rates to the Delta Dental Providers.  To the contrary, the low reimbursement rates, combined with the fact that Delta Dental Providers had little choice but to accept them due to Delta Dental's market dominance, has—for the reasons explained above—likely reduced the quality of care provided to patients in the relevant markets.

172.    The Revenue Restriction Conspiracy also has the anticompetitive effect of reducing the amount of competition among the Delta Dental State Insurers in each of the state, multi-state, or national markets in which they conduct business by directly reducing the extent to which the Delta Dental State Insurers will compete when conducting business *other* than under the Delta Dental brand.  Pursuant to the National Plans Agreement and implemented through the Delta Dental Plans Association, the Delta Dental State Insurers entered into the Revenue Restriction Conspiracy with the sole purpose of ensuring that they do not compete with each other's Delta Dental franchise business through non-Delta Dental branded business.  There is no pro-competitive benefit to the conspiracy, which exists solely to enhance the territorial divisions achieved by the Market Allocation Conspiracy and to preserve Defendants' market dominance so they can impose the Price Fixing Conspiracy.

173.    Absent the Market Allocation Conspiracy, the Price Fixing Conspiracy, and the Revenue Restriction Conspiracy, the Delta Dental State Insurers would compete with each other in respect of the state, multi-state, and national markets for health insurance, between and outside of their assigned territories, and in a way that would naturally produce higher reimbursement rates for the Delta Dental Providers and/or lower premiums for dental insurance plan sponsors and members.

## VI.    PLAINTIFF HAS SUFFERED ANTITRUST INJURY

174.    Plaintiff has suffered antitrust injury in respect of each of Defendants' conspiracies.

175.    The Market Allocation Conspiracy is a horizontal market allocation agreement that is illegal and has caused antitrust injury to Plaintiff.  By allocating the markets in which the Delta Dental State Insurers can offer dental insurance, Defendants have restrained competition in a way that has reduced the number of insurance plans available to dental patients served by the Delta Dental Providers, and thus restrained competition among dental insurance providers for the reimbursement rates offered to the providers.  Delta Dental Providers—faced with the overwhelming dominance of the Delta Dental State Insurers in their allocated territories, and the Delta Dental State Insurers' refusal to conduct business across or outside of those territories—are faced with a "take it or leave it" scenario for the reimbursement rates they are offered by the Delta Dental State Insurer in their territory.

176.    Absent the Market Allocation Conspiracy, there would be more competition among dental insurers for the insurance premium business of dental plan sponsors and members, and for the dental goods and services business of dentists and dental practices.  This competition would increase the reimbursement rates available to the Delta Dental Providers.  This

competition also would decrease the premiums (or increase the coverage) available to dental plan sponsors and members.

177.    The Price Fixing Conspiracy is also illegal and has caused antitrust injury to Plaintiff.  By colluding to fix the reimbursement rates paid by the Delta Dental State Insurers to the Delta Dental Providers, rather than allowing those rates to be set by competition among the Delta Dental State Insurers, Defendants have reduced competition and set artificially low the amounts that the Delta Dental Providers receive as reimbursement for goods and services provided to Delta Dental insureds.  Absent the conspiracy, competition among the Delta Dental State Insurers would naturally lead to higher reimbursement rates for the Delta Dental Providers.

178.    The Revenue Restriction Conspiracy is also illegal and has caused antitrust injury to Plaintiff.  By colluding to agree that the Delta Dental State Insurers will limit the revenue from non-Delta Dental branded business, Defendants have directly reduced the amount of competition in the market for dental insurance.  Absent the conspiracy, the Delta Dental State Insurers would conduct more dental insurance business apart from and in competition to their Delta Dental-branded dental insurance business.  This increased competition would again result in increased reimbursement rates to the Delta Dental Providers, who would have the choice of accepting patients (and thus reimbursement rates) under multiple insurance plans, and not just the Delta Dental plans from the Delta Dental State Insurers.

179.    The Delta Dental Providers have suffered direct harm as a result of Defendants' anticompetitive acts and conspiracies.  According to the American Dental Association's Health Policy Institute's most recent study, there were 198,515 practicing dentists in America. According to Delta Dental Plans Association, the 39 Delta Dental Plans have the largest network of dentists in the country and more than 78 million people are insured by Delta Dental.  While a dentist may decline to become a member of the Delta Dental network, to do so means being

denied immediate (or preferred) access to the largest group of potential dental patients in America because there are significant disincentives for patients to seek treatment by an "out-of-network" dentist. On information and belief, approximately 70% of the dentists in the country have signed or are bound by the Delta Dental Provider Agreement.

180. Given Delta Dental's market power, it can (a) charge consumers insurance premiums in keeping with, or even above, market rates, (b) pay dentists and dental practices below-market rates for services rendered to Delta Dental insureds pursuant to the Delta Dental Provider Agreement, and (c) retain the difference as a profit without being taxed upon it due to its "non-profit" status.

181. Delta Dental has exerted its monopsony power to pay less reimbursement to the Delta Dental Providers in a way that has had effects across the whole of the dental services industry in the United States. Since 2011, both GDP per capita, mean U.S. household income, and the average salary for a physician have been slowly and steadily growing. For example, as demonstrated in the following table, the average salary for a physician grew from $200,000 to $300,000 during that time:[13]

---

[13] Leslie Kane, *Medscape Physician Compensation Report 2018* (April 11, 2018) https://www.medscape.com/slideshow/2018-compensation-overview-6009667#3



**Physician Salary Trend**

182.   This salary increase for physicians reflects a broader trend, with growth in healthcare spending sitting at a robust 3.0%-5.8% per annum during the same period:

**Growth in Spending on Healthcare Services: 2010 to 2018**



Source: Altarum Center for Value in Health Care. Percentages are year-over-year.

183.   By contrast however, dentists on average have seen regular and consistent *declines* in their earnings.  As demonstrated by the following table, both general practitioner and specialist dentists have seen a decline of about 1.5% in their incomes since 2010, despite the broader healthcare trend:



Figure 1: Dentist Earnings, GDP Per Capita, Mean U.S. Household Income, 1981 to 2016 (2016 dollars)

Source: ADA Health Policy Institute; Bureau of Economic Analysis; U.S. Census Bureau, Current Population Survey. Note: Dentist net income data are based on the ADA Health Policy Institute annual *Survey of Dental Practice* with years 2000-2016 weighted to adjust for nonresponse bias. Shaded areas denote recession years according to National Bureau of Economic Research. GDP is deflated using the GDP deflator. Dentist earnings and U.S. household income are deflated using the All-Item CPI. All values are in constant 2016 dollars.

184. Moreover, the negative trends in the incomes of dentists and dental practices is *not* present in those segments of the dental market where the Delta Dental State Insurers are not present and exercising their monopsony powers. For example, dental insurance does not typically cover cosmetic procedures. As a result, customers do not select the dentists from whom they receive cosmetic dental services based on the insurance plans accepted by those dentists. Instead, dentists who provide cosmetic dental procedures are free to do so at the prices they set, and are not subject to the reimbursement rates provided by dental insurers like Delta Dental. Rates and revenues in the cosmetic dentistry market are thus free from significant interference by dental insurers like Delta Dental. Unsurprisingly, and in stark contrast to the

49

markets for dental services in which Delta Dental does operate, the U.S. market for cosmetic dentistry has grown and is projected to continue growing in the near future.[14]

185.     This case study makes clear the impact of Defendants' control over the Delta Dental Providers—the providers have lost earnings because Delta Dental has used its monopsony power to depress dental treatment reimbursement rates as compared to a competitive market environment.

## CLASS ACTION ALLEGATIONS

186.     Dr. Benton brings this action on behalf of himself and as a class action under Rules 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, and seeks injunctive relief on behalf of the following class (the "Injunction Class"):

> All Delta Dental Providers, not owned or employed by any of the Defendants, that provide dental goods or services within the United States.

187.     Dr. Benton brings this action on behalf of himself and as a class action under Rules 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, and seeks monetary damages on behalf of the following class (the "Damages Class"):

> All Delta Dental Providers, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Insured pursuant to a Delta Dental insurance policy within the United States and within four years of the date of filing of this action.

---

[14]    Grand View Research, *Cosmetic Dentistry Market Analysis, By Product (Dental Systems & Equipment, Dental Implants, Dental Bridges, Dental Crowns, Dental Veneers, Orthodontic Braces, Bonding Agents, Inlays & Onlays), By Region (U.S., Canada, Germany, U.K., China, India, South Africa, Brazil, Mexico), And Segment Forecast To 2024* (July 2016).

188.   Plaintiff believes there are thousands of members of the Class as described above, the exact number and their identities being known by Delta Dental, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

189.   There are numerous questions of law and fact common to each Class member, including, but not limited to:

     a.   Whether the conduct of Defendants in respect of the Market Allocation Conspiracy as alleged in this complaint caused damages to Plaintiff and other members of the Class and the amount and extent of those damages;

     b.   Whether the conduct of Defendants in respect of the Revenue Restriction Conspiracy as alleged in this complaint caused damages to Plaintiff and other members of the Class and the amount and extent of those damages;

     c.   Whether the conduct of Defendants in respect of the Price Fixing Conspiracy as alleged in this complaint caused damages to Plaintiff and other members of the Class and the amount and extent of those damages; and

     d.   Whether the conduct of Defendants in respect of the three above-described conspiracies combined in full, or in part, caused damages to Plaintiff and other members of the Class and the amount and extent of those damages.

190.   Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, has interests coincident with and not antagonistic to those of the other members of the Class, and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

191.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

192.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

193.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of Delta Dental Plans Association and/or the Delta Dental State Insurers or others, and a class action will eliminate the possibility of repetitious litigation.

194.     Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate claims such as those asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT ONE – INJUNCTIVE RELIEF PER 15 U.S.C. §§ 1, 2 & 26

195.     Plaintiff incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

196.     This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

197.     As explained in Counts Two and Three, Defendants' Market Allocation Conspiracy, their Price Fixing Conspiracy, and their Revenue Restriction Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S. C. § 1 under a per se, quick look, or rule of reason analysis.

198.    As explained in Counts Four and Five, Defendants' conduct also constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

199.    Defendants' unlawful conduct threatens to continue to injure Plaintiff.  Plaintiff seeks a permanent injunction prohibiting Defendants and all others acting in concert from continuing their illegal conspiracies and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

200.    Plaintiff reserves the right to seek preliminary injunctions as necessary.

<u>**COUNT TWO – MONETARY DAMAGES AND INTEREST**</u>

<u>**PER 15 U.S.C. §§ 1 & 15**</u> **(MARKET ALLOCATION CONSPIRACY)**

201.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

202.    Plaintiff brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

203.    As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

204.    Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Delta  Dental State Insurers.   By so doing, Delta Dental has agreed to suppress competition and to increase its profits by decreasing payments to Delta Dental Providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, Delta Dental Providers who choose not to be in-network have an extremely limited market for the dental services they provide. Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

205.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiff has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## COUNT THREE – MONETARY DAMAGES AND INTEREST

## PER 15 U.S.C. §§ 1 & 15

### (PRICE FIXING AND REVENUE RESTRICTION CONSPIRACIES)

206.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

207.    Plaintiff brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

208.    As alleged more specifically above, the Price Fixing and Revenue Restriction Conspiracies operate in addition to and reinforce the Market Allocation Conspiracy.  The Conspiracies alleged in this Count also represent a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and are a per se violation of the Act.

209.    Through the Price Fixing and Revenue Restriction Conspiracies, Delta Dental and the Delta Dental State Insurers have agreed among themselves to fix reimbursement rates for Delta Dental Providers, and to limit the amount of business the Delta Dental State Insurers will do in competition with the Delta Dental plans.  By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to the Delta Dental Providers at less than competitive levels in violation of Section 1 of the Sherman Act.  Defendants' price fixing and revenue restriction agreement is per se illegal under Section 1 of the Sherman Act.

210.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiff has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than but for Defendants' anticompetitive agreement.

211.     Plaintiff seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT FOUR – MONETARY DAMAGES AND INTEREST

## PER 15 U.S.C. §§ 2 & 15 (MONOPSONIZATION)

212.     Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

213.     Plaintiff brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

214.     As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above.  This monopsony power has been durable, lasting for decades.

215.     Defendants' creation of monopsony power was willful.  An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

216.     By willfully creating or maintaining monopsony power, Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States."

217.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiff has suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than but for Defendants' anticompetitive agreement.

218.    As alleged above, the Defendants' use of their market power has also reduced the output of insurance for dental services.

## COUNT FIVE – MONETARY DAMAGES AND INTEREST

## PER 15 U.S.C. §§ 2 & 15 (CONSPIRACY TO MONOPSONIZE)

219.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

220.    Plaintiff brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

221.    As alleged more specifically above, Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power.  Defendants specifically intended to create monopsony power.  An express purpose of their agreements was to prevent Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.  All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them.  This conspiracy has affected a substantial amount of interstate commerce.

222.     By conspiring to create or maintain monopsony power, Defendants have

conspired to violate Section 2 of the Sherman Act, 15 U.S.C. §2, which prohibits monopolization

of "any part of the trade or commerce among the several States."

223.     As a direct and proximate result of Defendants' continuing violations of Section 2

of the Sherman Act, Plaintiff has suffered and continues to suffer injury and damages of the type

that the federal antitrust laws were designed to prevent.  Such injury flows directly from that

which makes Defendants' conduct unlawful.  These damages consist of having been paid less,

having been forced to accept far less favorable rates and other contract terms, and/or having

access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

224.     As alleged above, Defendants' use of their market power has also reduced the

output of insurance for dental services.

## PRAYER FOR RELIEF

225.     WHEREFORE, Plaintiff, on behalf of himself and the proposed Class of similarly

situated persons and entities, respectfully requests that the Court:

a.     Determine that this action may be maintained as a class action under Rule
       23 of the Federal Rules of Civil Procedure and Appoint Plaintiff as a Class
       Representative, and Counsel for Plaintiff as Class Counsel;

b.     Adjudge and decree that Defendants have violated Section 1 of the
       Sherman Act;

c.     Adjudge and decree that Defendants have violated Section 2 of the
       Sherman Act;

d.     Permanently enjoin Defendants from entering into, or from honoring or
       enforcing, any agreements that restrict the territories or geographic areas
       in which any Delta Dental State Insurers may compete;

e.  Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.  Permanently enjoin Defendants from continuing with the Price Fixing and Revenue Restriction Conspiracies and to remedy all effects or vestiges of those conspiracies;

g.  Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

h.  Require on-going periodic reporting on compliance by the Defendants, monitoring by the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

i.  Award Plaintiff and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiff and members of the Class as proven at trial;

j.  Award costs and attorneys' fees to Plaintiff;

k.  Award prejudgment interest; and

l.  Award any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 11, 2019

Respectfully submitted,

                                  **QUINN EMANUEL URQUHART &**
                                     **SULLIVAN, LLP**

                                  By:  */s/ Leonid Feller, P.C.*
                                  Leonid Feller, P.C.
                                  Athena Dalton
                                  191 N. Wacker Drive, Suite 2700
                                  Chicago, Illinois 60606
                                  Telephone (312) 705-7400
                                  leonidfeller@quinnemanuel.com
                                  athenadalton@quinnemanuel.com

                                  Stephen Neuwirth
                                  Toby E. Futter
                                  Joseph N. Kiefer
                                  51 Madison Avenue, 22nd Floor
                                  New York, New York 10010
                                  Telephone: (212) 849-7000
                                  stephenneuwirth@quinnemanuel.com
                                  tobyfutter@quinnemanuel.com
                                  josephkiefer@quinnemanuel.com

                                  **CARNEY, BATES, AND PULLIAM, PLLC**
                                  William P. Creasman
                                  519 W. 7th St.
                                  Little Rock, Arkansas 72201
                                  Telephone: (501) 312-8500
                                  wcreaseman@cbplaw.com